## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
|                                         :
ALICIA STRANZL,                           :        CIVIL ACTION
                          Plaintiff,      :
                                          :
     vs.                                  :        NO. 13-1393
                                          :
DELAWARE COUNTY,                          :
                          Defendant.      :
_____:

Henry S. Perkin, M.J.                                    July 14, 2014

### MEMORANDUM

This matter is before the Court on Defendant Delaware County's Motion for Summary Judgment filed March 4, 2014. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment was filed April 2, 2014. With leave of Court, Defendant Delaware County's Reply Brief in Support of its Motion for Summary Judgment was filed April 11, 2014. Having reviewed and considered the contentions of the parties, the Court is prepared to rule on this matter.

Plaintiff, Alicia Stranzl ("Ms. Stranzl"), alleges that Defendant, Delaware County, through its office of Children & Youth Services ("CYS"), violated her rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. Section 12101 (2009), by creating a hostile work environment; the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. Sections 955 and 962, for discriminating against her based on her disability; and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. Section 2615, for retaliation following her FMLA leave.

## I.  FACTS

Based upon the record papers, exhibits, depositions, and the parties' statements of the facts, the pertinent facts to this Court's determination follows.

On July 30, 2007, Ms. Stranzl was hired by CYS as an Intake Caseworker I.  Am. Compl. ¶ 3.  She was promoted to Intake Caseworker II on February 5, 2008, a promotion that increased her workload and salary.  Am. Compl. ¶ 3; Stranzl Dep. 13: 23-16:1.  CYS is split into two local offices: the Chester Office and the Upper Darby Office.  As a caseworker, Ms. Stranzl worked in the Chester Office.  Am. Compl. ¶ 22; Def's Reply Br. Supp. Mot. Summ. J. 9.

In 2010 and 2011, Ms. Stranzl applied to the Child Welfare Education for Leadership ("CWEL") scholarship program, a program offered by Delaware County through a third party, the University of Pittsburgh.[1]  Am. Compl. ¶ 6; Stranzl Dep. 22:14-23:11, Grant Dep. 8:12-14.  In 2011, she was accepted into the CWEL program along with one other applicant, Crystal Maxwell ("Maxwell").  Stranzl Dep. 23:10-11.  By agreeing to a two-year work commitment to Delaware County following completion of her Master's program in social work at a variety of eligible universities, Ms. Stranzl could have her education costs covered with a guaranteed placement with CYS following graduation.  Am. Compl. ¶ 6; Stranzl Dep. 20:7-24; Grant Dep. 8:12-14.  Beginning in August 2011, Ms. Stranzl began taking graduate classes through the CWEL program at Widener University.  Stranzl Dep. 24:21-22.

On January 9, 2012, Mary Grant ("Grant"), Staff Development and Community Education Administrator, informed Ms. Stranzl that she wanted to meet with her and her co-worker, Maxwell.  Am. Compl. ¶ 7, Grant Dep. 7:3-9.  Grant informed both Ms. Stranzl and Maxwell, who was also in the CWEL program, that the CWEL program had not been properly

---

[1] The CWEL program is a cooperative effort among the United States Administration for Children and Families, the Pennsylvania Department of Public Welfare, the Pennsylvania Child and Youth Administrators, and eleven accredited schools of social work in Pennsylvania.  *See* http://www.socialwork.pitt.edu/researchtraining/child-welfare-ed-research-programs/cwel (last visited July 9, 2014).  Delaware County selects three applicants, including one alternative, from all CWEL applications.  Stranzl Dep. 17:23.  Following Delaware County's selection, the top two applicants apply through the University of Pittsburgh.  Stranzl Dep. 24:1-6.  Once approved by the University of Pittsburgh, the applicant applies to a CWEL program-approved university, such as Widener University.  Stranzl Dep. 24:7-12.

administered and as a result, CYS had been "double dipping" funds.[2]  Am. Compl. ¶ 8; Grant

Dep. 16:5-8.  Grant stated that the agency was unknowingly violating federal funding provisions,

by simultaneously paying CWEL students for their field placements (internships) and for CWEL

students' salaries.  Am. Compl. ¶ 9, Grant Dep. 7:23-25, 9:15-20.  Simply, while students

continued to receive salaries for their full time jobs as caseworkers, they also were paid for their

field placements, resulting in the inadvertent "double dipping" of federal funds.  Grant Dep.

10:11-11:13.

　　　Ms. Stranzl was informed that CYS and the University of Pittsburgh were working

together to correct the funding issue and had devised two options to solve the problem: withdraw

from the CWEL program and pay all tuition costs incurred or sign a new contract agreeing to go

to school full-time and take a two-year paid leave of absence with benefits while completing

their degree.  Am. Compl. ¶ 10, 11.  When Grant met with Ms. Stranzl and Maxwell, CYS had

already decided to implement the full-time option for current CWEL participants, like Ms.

Stranzl and Maxwell, who were not yet in field placements.  Grant Dep. 13:11-16.  Ms. Stranzl

was advised that the full-time option still guaranteed her a job with CYS upon graduation, but

not her current position.  Am. Compl. ¶ 12.  Ms. Stranzl asked questions regarding the full-time

student option, and Grant informed her that she would get back to her with answers to her

questions.  Am. Compl. ¶ 13.  Grant did not get back to Ms. Stranzl.  Stranzl Dep. 32:15.

　　　During the January 9, 2012 meeting, Grant also told Ms. Stranzl and Maxwell that due to

economic concerns and the CWEL program funding issue, both Ms. Stranzl and Maxwell would

---

[2] In her deposition, Ms. Stranzl calls the finding an "undercover investigation," and in Grant's deposition, Plaintiff's counsel calls it an "internal audit," mischaracterizing the funding issue.  Stranzl Dep. 28:13-16; Grant Dep. 16:12-13.  When asked if Grant ever called the audit an "undercover investigation,"  Ms. Stranzl admitted Grant never used those words.  Stranzl Dep. 28:21-24.  Despite this admission, Plaintiff's counsel continues to reference an "investigation" in his pleadings.  Am. Compl. ¶ 8; Pl.'s Mem. Law Opp. Def.'s Mot. Dismiss. 2; Pl.'s Mem. Law Opp. Def.'s Mot. Summ. J. 2.

be completing their CWEL program field placements with CYS, rather than another county or agency department due to the economy.  Stranzl Dep. 78:10-13.  Ms. Stranzl hoped to complete her field placement at the CYS Chester Office because it was "easier than the stress of a new environment and learning something new" and it was "a lot easier because you know everybody."  Stranzl Dep. 78:17-25.

Within a week of Ms. Stranzl's January 9, 2012 meeting with Grant, Ms. Stranzl met with Debra Plummer ("Plummer"), the CYS Intake Administrator.  Stranzl Dep. 32:16-25. Plummer stated that it was her understanding that Ms. Stranzl had questions regarding the changes to CWEL and wanted to address them.  Am. Compl. ¶ 14.  Ms. Stranzl informed Plummer of her questions and concerns, and further informed Plummer that she had also addressed those questions and concerns with Grant, who never responded with answers.  Am. Compl. ¶ 15. Plummer also informed Ms. Stranzl that she would respond to her questions and concerns.  Am. Compl. ¶ 16.

When neither Grant nor Plummer gave Ms. Stranzl answers to her questions and concerns, Ms. Stranzl contacted the University of Pittsburgh's Principal Investigator, Dr. Helen Calahane ("Calahane") directly via email on January 24, 2012.  Am. Compl. ¶ 17.  Ms. Stranzl's email was forwarded to Carolyn Donahue ("Donahue"), the Agency Coordinator, who emailed Ms. Stranzl on January 25, 2012.  Stranzl Dep. 54: 11-12.  Donahue stated that she would discuss her questions and concerns via email or telephone and copied Grant on the response email.  Am. Compl. ¶ 18; Stranzl Dep. 54:12-16.  Ms. Stranzl called Donahue on January 26, 2012 and confirmed she could keep her current CWEL options and not enter into a different agreement.[3] Am. Compl. ¶ 19; Stranzl Dep. 54: 17-18.  Donahue gave Ms. Stranzl detailed answers and

---

[3] Although in her deposition Ms. Stranzl details her conversation with Donahue not Calahane, Plaintiff's counsel repeatedly refers to Donahue as Calahane throughout his pleadings.  Am. Compl. ¶ 19, Pl.'s Mem. Law Opp. Def.'s Mot. Dismiss 5-6.

ultimately helped her understand the full-time CWEL option.  Stranzl Dep. 56:18-22.  At the

time the funding issue was recognized, Ms. Stranzl was working full-time at CYS and taking

classes on nights and weekends.  Stranzl Dep. 25:2-12. 37: 15-20.  Ms. Stranzl was still a

semester away from field placement, so the CWEL program change did not immediately affect

her program, and Ms. Stranzl began the spring 2012 semester.  Stranzl Dep. 77:17-22, Grant

Dep. 11: 18-12:3.

Ms. Stranzl was diagnosed with Attention Deficit Disorder ("ADD") in approximately

2001 as an undergraduate.  Def's. Mem. Supp. Summ. J. ¶ 22.  Ms. Stranzl did not notify CYS of

this diagnosis.  *Id*.; Stranzl Dep. 49:9-12.  Her co-workers did not know about Ms. Stranzl's

ADD prior to February 23, 2012.  Mabry-Givens Dep. 6:17-20; Plummer Dep. 9:22-10:3.  Ms.

Stranzl never had severe anxiety prior to January, 2012.  Stranzl Dep. 44:14-18, 49:4-8.  The

only medications she took were Adderall for ADD and Seroquel, as needed, to help her sleep.

Stranzl Dep. 45:20-21, 47:17-48:12.

After January 9, 2012, when Ms. Stranzl met with Grant regarding changes to the CWEL

program, Ms. Stranzl first began experiencing stress and anxiety.  Stranzl Dep. 38:8-10.  Ms.

Stranzl claims she had more work than the average caseworker, more cases, and had to complete

detailed and time-consuming timesheets or calendars accounting for every minute of the work

day.  Stranzl Dep. 39:1-40:25.  Due to her increased work load, Ms. Stranzl was late for classes.

Stranzl Dep. 39:2-3.  Ms. Stranzl felt singled out by her supervisors, Vanessa Mabry-Givens

("Mabry-Givens"), CYS Intake Supervisor, and Plummer.  Stranzl Dep. 41:7-13.  Between

January 9, 2012 and February 23, 2012, Ms. Stranzl had trouble sleeping every night, took

Seroquel daily, and experienced panic attacks, something she had never experienced.  Stranzl

Dep. 48:22-49:8.

On February 23, 2012, Ms. Stranzl was scheduled to take a mid-term examination that evening and she became visibly upset while at work.  Stranzl Dep. 49: 23-50:2; 64:23-65:2.  Mabry-Givens Dep. 7:11-12.  Ms. Stranzl was talking to Mabry-Givens in the office kitchen, telling Mabry-Givens how she was upset with the way Plummer was treating her.  Stranzl Dep. 49:23-25.  Plummer was not in the office during this conversation, but Karen Kilson ("Kilson"), another CYS Intake Supervisor, was nearby.  Stranzl Dep. 49:16-50:2, 58:24; Plummer Dep 7:6-9.  Ms. Stranzl saw Kilson look at her while Kilson spoke on her cell phone, and within five minutes, Plummer entered the office.  Stranzl Dep.  49:22-50:11, Plummer Dep. 7:12-14.  Plummer asked Ms. Stranzl to go to Plummer's office, but Ms. Stranzl requested that a union representative be present.  Stranzl Dep. 50:11-16.  Once Donna Hollis, a Service Employees International Union Representative, arrived, Ms. Stranzl and Plummer began to talk, and Ms. Stranzl expressed her discontent with the way she was being treated at work; the way Grant never contacted her following their January 9, 2012 meeting regarding the CWEL program; the way the changes to the CWEL program had been all verbal; and other similar concerns.  Stranzl Dep. 51:22-53:11.  For a brief time, Mabry-Givens was present in Plummer's office.  Stranzl Dep. 60:2-5.  Plummer called Ms. Stranzl "incoherent" while Ms. Stranzl was crying hysterically.  Am. Compl. ¶ 40, Stranzl Dep. 60:13-23; Plummer Dep. 9:3-7.  After Mabry-Givens left Plummer's office, two women who identified themselves as Project Reach employees entered the office.  Stranzl Dep. 60:7-15.  Project Reach, a mental health mobile unit, was called by a CYS employee.[4]  Am. Compl. ¶ 40, Mabry-Givens Dep. 9:4-5.  After assessing

---

[4] Taking the facts, as we must, in the light most favorable to Ms. Stranzl as the non-moving party, her allegation that she was "shuffled off to a 'suicide watch' team," Pl.'s Mem. Law Opp. Def.'s Mot. Summ. J. 14, or "suicide squad," Stranzl Dep. 67:5-6 seems an exaggeration given Ms. Stranzl's state at the time Project Reach was called and Plummer's statement that there was no fear Ms. Stranzl might commit suicide.  Plummer Dep. 8:9-12.  Mabry-Givens and Plummer both called Project Reach a "mobile mental health unit" in their depositions, and Plummer described Project Reach's duties as assessing mental health.  Mabry-Givens Dep. 8:25; Plummer Dep. 8:25.

Ms. Stranzl with her permission, the Project Reach employees suggested she take a few days off because of severe stress, and Ms. Stranzl left work early.  Ms. Stranzl Dep. 66:7-13.

On February 29, 2012, while still out of work, Ms. Stranzl met with her treating psychiatrist, John Mitchell ("Dr. Mitchell"), who originally recommended that Ms. Stranzl take a medical leave until March 5, 2012 due to a mental health disability.  Stranzl Dep. 75:1-5.  Ms. Stranzl was treated by Dr. Mitchell beginning in 2006 and met with him approximately every three months or "whenever something was going on."  Stranzl Dep. 45:6-19.  Ms. Stranzl met with Dr. Mitchell more frequently after January 9, 2012.  Stranzl Dep. 65:12-66:18.  Dr. Mitchell twice suggested Ms. Stranzl retain an attorney after Ms. Stranzl informed him of the CWEL program changes and her concerns: once toward the end of January 2012 after Ms. Stranzl informed him about the CWEL funding issue and her concerns with her CWEL contract and another time after February 23, 2012.  Stranzl Dep. 71:10-73:18.  Ms. Stranzl's three month FMLA leave was approved on March 12, 2012 and after an extension, was approved through September 12, 2012.  Stranzl Dep. 76:14-77:4.  Ms. Stranzl was on paid FMLA leave until June 4, 2012.  Def.'s Mem. Supp. Mot. Summ. J. 6.  Following June 4, 2012, Ms. Stranzl "requested a personal leave with no pay" and began paying $770 each month for COBRA medical benefits. Stranzl Dep. 77:5-7.  For three months—from when her paid FMLA leave expired on June 4, 2012 to when she returned to CYS as in intern performing filed placement work on September 12, 2012—Ms. Stranzl continued to receive paychecks even though she was on unpaid personal leave.  Stranzl Dep. 85:23-86:19; Def.'s Reply Br. Supp. Mot. Summ. J. 7 n.2.  The Delaware County Controller's office estimates approximately $7,500 of overpayments for this period to Ms. Stranzl.  Stranzl Dep. 85:23-86:19; Def.'s Reply Br. Supp. Mot. Summ. J. 7 n.2.

Ms. Stranzl was cleared by her psychiatrist to return full-time to Widener University for the fall 2012 semester and began her second year in the CWEL program with classes starting on August 29, 2012.  Stranzl Dep. 77:17-20.  On September 4, 2012, Ms. Stranzl began her field placement, the internship component of the CWEL program, in the CYS Upper Darby Office under Administrator, Gretchen Sidler ("Sidler").  Stranzl Dep. 77:23-78:2.  As a full-time CWEL student, Ms. Stranzl went to school full-time and only had to return to work as an intern when her leave from school exceeded fifteen workdays.  Grant Dep. 15:1-5.  Both Ms. Stranzl and Maxwell were assigned to cases involving adolescent placement with a focus on independent living.  Stranzl Dep. 79:12-15, 83:7-11.

Worried her name might not be in the payroll system after returning from her FMLA leave, Ms. Stranzl emailed Missy Grotz ("Grotz"), the Chester CYS Office Manager, on September 8, 2012 to confirm that her information was still in the system and that she would receive her next paycheck.  Am. Compl. ¶ 26-27; Stranzl Dep. 84:6-22.  Ms. Stranzl did not get a response from Grotz, but received a paycheck on time on October 2, 2012; however, the paycheck was short seventy-five hours, or about ten days of pay.  Am. Compl. ¶ 27; Stranzl Dep. 84:6-87:3.  Ms. Stranzl emailed her CWEL Placement Administrator, Sidler, to inform Sidler that her paycheck was missing the hours she worked from August 29, 2012 through September 14, 2012.  Am. Compl. ¶ 29; Stranzl Dep. 85:1-7.  Ms. Stranzl did not get an email response from Sidler, but on the same day Ms. Stranzl emailed Sidler, Sidler hand-delivered Ms. Stranzl a check rectifying the difference in pay.  Stranzl Dep. 85:4-22; Def's Reply Br. Supp. Mot. Summ. J. 7.

Upon transferring to the Upper Darby Office, Ms. Stranzl requested that files from her old office computer in Chester be transferred to her new office computer.  Stranzl Dep. 81:2-82:6.

Although a file transfer was possible, Ms. Stranzl's request was denied.  Stranzl Dep. 82:11-16.  Ms. Stranzl was told by the Information Technology technician that Plummer disallowed her files from being transferred.  Stranzl Dep. 82:13-16.  Maxwell, Ms. Stranzl's fellow CWEL participant who stayed in the Chester Office for her CWEL field placement, was allowed to have her files transferred from one computer in the Chester Office to another computer in the Chester Office when she began her field placement internship.  Stranzl Dep. 82:17-83:11.

Following the end of her leave without pay, Ms. Stranzl's medical insurance coverage expired on August 31, 2012; however, Ms. Stranzl did not realize the lapse in coverage until close to November 2012, when she was a full-time student.  Stranzl Dep. 86:24-87:7.  Ms. Stranzl called Marilyn Ayres ("Ayres"), a CYS personnel representative, to inquire about her insurance coverage.  Stranzl Dep. 87:8-9.  Ayres told Ms. Stranzl to call Carol Bradley ("Bradley"), a CYS employee who dealt with insurance issues.  Stranzl Dep. 8-12.  After two weeks of contacting Bradley to no avail, Ms. Stranzl emailed Ayres on November 19, 2012 regarding her unsuccessful attempts to contact Bradley.  Stranzl Dep. 87:17-23.  On that same day, Ayres contacted Bradley and Ms. Stranzl's medical coverage was reinstated.  Stranzl Dep. 87:24-88:4.

On December 10, 2012, Ms. Stranzl emailed Sidler, her CWEL Placement Administrator, and Terry Cody ("Cody"), the Office Manager in the Upper Darby Office who dealt with payroll, regarding her paycheck for the pay period beginning on November 16, 2012 which was short thirty hours or $212.49.  Am. Compl. ¶ 31; Stranzl Dep. 88:10-16.  The $212.49 difference in pay was never rectified.  Am. Compl. ¶ 35; Stranzl Dep. 88:14-24.

Ms. Stranzl remains a Delaware County employee in a leave of absence status in the CWEL program until she completes her degree.  Stranzl Dep. 92:19-21; Plummer Dep. 11:3-5;

Grant Dep. 14:22-23.  She was scheduled to graduate with her Master's degree in social work in May 2014.  Stranzl Dep. 92:22-23.

## II.   <u>STANDARD OF REVIEW</u>

Pursuant to Rule 56(a), summary judgment is proper where there is no genuine issue of material fact.  FED. R. CIV. P. 56(a).  In viewing the evidence in the light favorable to the non-moving party, summary judgment will be granted against a party who does not make a sufficient showing to establish "an element essential to that party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986).

The moving party carries the initial burden to inform the court of the basis for its summary judgment motion; to produce evidence to establish a prima facie case as to each element; and to identify the absence of no genuine issue of material fact.  *Id*.  When the non-moving party cannot establish an essential element and there is "no genuine issue as to any material fact," the moving party is entitled to summary judgment as a matter of law.  *Id*. at 322.

Material facts are those that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  Mere factual disputes will not preclude summary judgment when they are irrelevant to the outcome of the suit.  *Id*.  An issue is "genuine" if a reasonable trier of fact could return a favorable verdict for the non-moving party.  *Mengel v. Reading Eagle Co.*, CIV.A. 11-6151, 2013 WL 1285477 (E.D. Pa. Mar. 29, 2013), *appeal dismissed* (Oct. 30, 2013) *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

To defeat summary judgment, the non-moving party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(c).  Moreover, the non-moving party cannot rely on unsupported assertions, conclusory allegations,

or mere suspicions to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) *citing Celotex*, 477 U.S. at 325. Where the non-moving party will have the burden of proof at trial, the moving party can make a showing that there is an "absence of evidence to support the non-moving party's case." *Jones v. Indiana Area Sch. Dist.*, 397 F.Supp.2d 628, 642 (W.D. Pa. 2005) *quoting Celotex*, 477 U.S. at 325.

## III.   DISCUSSION

### A.   Count I: ADA Claim

The ADA seeks to provide clear and comprehensive enforceable standards in order to address the discrimination against those with disabilities. 42 U.S.C. § 12101(b) (2009). The ADA prohibits any entity from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2009). To establish a prima facie case for such a claim, the plaintiff must show (1) she is disabled within the meaning of the ADA; (2) that she is otherwise qualified for the job with or without reasonable accommodations; and (3) that she was subject to an adverse employment action because of her disability. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).[5] Establishing a prima facie case is a highly factually dependent analysis, not requiring proof of different treatment for similarly situated comparators. *Abbasi v. SmithKline Beecham Corp.*, CIV.A 08-277, 2010 WL 1246316 (E.D. Pa. Mar. 25, 2010).

---

[5] In his Response to the Motion for Summary Judgment, Plaintiff's counsel provides a detailed discussion of whether Ms. Stranzl was disabled according to the ADA definition, but he omits any discussion regarding Ms. Stranzl's qualifications for her job. More importantly, no case law is supplied to support Ms. Stranzl's claim that she was subjected to four different adverse employment actions.

An ADA claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Rubano v. Farrell Area Sch. Dist.*, CIV.A. 11-1574, 2014 WL 66457 (W.D. Pa. Jan. 8, 2014) *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  Once the plaintiff has established a prima facie case, the burden shifts to the defendant to state a "legitimate, nondiscriminatory reason" for the action.  *Solomon v. Sch. Dist. of Philadelphia*, 882 F. Supp. 2d 766, 782 (E.D. Pa. 2012) *citing Majewski v. Fischi,* 372 F. App'x. 300, 304 (3d Cir. 2010).  If that burden is met, the presumption of discriminatory action raised by the prima facie case is rebutted.  *Id*.  The plaintiff may respond by showing the defendant's reason was pretextual by casting sufficient doubt upon each reason proffered so that a trier of fact could reasonably conclude that each reason was a fabrication or infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.  *Id*.

The ADA recognizes two general types of adverse actions: (1) failure to make reasonable accommodations to the known disabilities of an otherwise qualified employee; or (2) retaliation, the disparate treatment employment discrimination actions.  42 U.S.C. § 12112(b)(5)(A); *Solomon*, 882 F. Supp.2d at 777.  The current ADA claim falls under the latter of the two categories; Ms. Stranzl claims her employer took an adverse employment action against her because of her disability.

1.    <u>Disability</u>

If disabled, the ADA affords protections against discrimination to members who fall within that class of persons.  42 U.S.C. § 12112(a).  In 2008, Congress passed the ADA Amendments Act of 2008 ("ADAAA"), broadening the definition of "disabled."  ADA AMENDMENTS ACT OF 2008, PL 110–325, September 25, 2008, 122 Stat 3553.  The ADAAA defines "disabled" in three ways: (1) as "a physical or mental impairment that

substantially limits one or more major life activities with such "major life activities" including working, 42 U.S.C. § 12102(1)(A), (2)(A); (2) there is a record of such an impairment, § 12102(1)(B); and (3) one can be regarded as disabled when one's employer "mistakenly believed" the employee was either disabled or that an "actual non-limiting impairment substantially limits one or more major life activities. § 12102(1)(C); *Wilson v. MVM, Inc.*, 475 F.3d 166, 179 (3d Cir. 2007) *citing Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 487 (1999). Ms. Stranzl contends she was disabled or, in the alternative, that she was "regarded as" disabled.

After the February 23, 2012 episode when Ms. Stranzl became visibly upset and went home and underwent a six month FMLA leave, it is likely her supervisors, who witnessed the entire February 2012 event, believed Ms. Stranzl had a disability. Although prior to this event, Ms. Stranzl's co-workers did not know of Ms. Stranzl's mental health problems, following the events on February 23, 2012 and her FMLA leave, Ms. Stranzl falls within the "regarded as" disabled definition under the ADA.

Additionally, both Project Reach and Ms. Stranzl's psychiatrist suggested she take leave from work. Ms. Stranzl was diagnosed with ADD in approximately 2001, and after the February 23, 2012 incident, Ms. Stranzl's treating psychiatrist diagnosed her with poor concentration, anxiety, anxiety attacks, panic attacks, pressured speech, excitability, agitation, insomnia, depression, and distraction. Thus, Ms. Stranzl's history of ADD paired with her more recent diagnoses qualify her under the ADAAA as having "a physical or mental impairment that substantially limits one or more major life activities."

2. Qualified Individual

In evaluating whether a plaintiff is a "qualified individual with a disability," a plaintiff must "satisf[y] the prerequisites for the position, such as possessing the appropriate educational

background, employment experience, skills, licenses, etc." and, the plaintiff must be able to "perform the essential functions of the position held or desired, with or without reasonable accommodations." *Taylor*, 184 F.3d at 311 (3d Cir. 1999) *quoting Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

Neither Ms. Stranzl nor CYS dispute that Ms. Stranzl was qualified for her normal duties. As of September 2012 when she returned from FMLA leave, Ms. Stranzl was a CYS employee for over five years; had obtained a Bachelor's degree prior to her employment with CYS; and had partially completed requirements for her Master's degree in social work.  After returning from FMLA leave, Ms. Stranzl did not return to CYS to resume working as a full-time caseworker, but returned in the capacity of a full-time student and intern completing her field experience requirement through the CWEL program.  Ms. Stranzl remained a full-time student throughout the time in which she claims her rights were violated and throughout the entirety of this lawsuit.

3.   Adverse Employment Action

Within the meaning of the ADA, an "adverse employment action" is one that a reasonable employee would have found materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2417, 165 L. Ed. 2d 345 (2006) *citing Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006).  Only "materially" adverse employment actions support an ADA claim, as opposed to "trivial harms." *Burlington N.*, 548 U.S. 53, 54 (2006).  Thus, "petty slights or minor annoyances" are not

materially adverse.[6]  *Id*. at 68; *see also Langley v. Merck & Co., Inc., 186 F. App'x 258, 260 (3d*

*Cir. 2006) ("Minor actions, such as lateral transfers and changes of title and reporting*

*relationships, are generally insufficient to constitute adverse employment actions")*; *Uber v.*

*Slippery Rock Univ. of Pennsylvania*, 887 A.2d 362, 369 (Pa. Commw. Ct. 2005).  However,

individual acts that may not independently rise to the level of materially adverse actions may be

aggregated to establish a hostile work environment claim.  *Mandel v. M & Q Packaging Corp.*,

706 F.3d 157, 165 (3d Cir. 2013).

The employment action must be "serious and tangible enough to alter an employee's

compensation, terms, conditions, or privileges of employment." *Uber*, 887 A.2d at 368 (holding

overall "good" performance evaluation containing two "fair" ratings instead of "good" ratings

not adverse employment action because plaintiff's then-present position and/or future position

not negatively affected and "evaluation did not affect the hours he worked, his duties, his salary,

his benefits, or his opportunities for overtime").  Thus, it is not enough to show that there has

been an adverse action; the action must be one "motivated by prejudice and fear of disabilities."

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).

"Context matters" when determining if an action constitutes as an adverse employment

action.  *Burlington N.*, 548 U.S. at 69 *citing Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S.

75, 81 (1998) ("The real social impact of workplace behavior often depends on a constellation of

surrounding circumstances, expectations, and relationships which are not fully captured by a

simple recitation of the words used or the physical acts performed").  An adverse employment

action is one "serious and tangible enough to alter an employee's compensation, terms,

---

[6] Plaintiff's counsel cites case law that has "expanded the scope of retaliation claims" and what constitutes adverse employment actions; however  the cases pertaining to adverse employment actions are merely persuasive since they are from Courts outside of this Circuit.

conditions, or privileges of employment." *Uber*, 887 A.2d at 368.  "An employer's decision which has intangible and indirect effects on an employee's status does not qualify as 'adverse' action." *Simmerman v. Hardee's Food Sys., Inc.*, CIV. A. 94-6906, 1996 WL 131948 (E.D. Pa. Mar. 22, 1996) *aff'd.,* 118 F.3d 1578 (3d Cir. 1997) *citing Lefevre v. Design Professional Ins. Cos. & Thomas Coppinger,* 1994 WL 544430 at 1 (N.D.Cal., Sept. 27, 1994).

Ms. Stranzl points to four alleged adverse employment actions to support her ADA claim: (1) her office was moved from Chester to the Upper Darby Office; (2) her files were not transferred from her old computer to her new computer; (3) she did not receive a response to inquiries regarding an issue with her September 21, 2012 paycheck; and (4) she did not receive a response to inquiries regarding another paycheck for the pay period beginning on November 16, 2012.  Each alleged incident is hereinafter examined.

      a.   *Relocation From Chester to Upper Darby*

First, Ms. Stranzl argues that her move from the Chester Office to the Upper Darby Office is evidence of an adverse employment action by CYS.  In *Torre*, a case decided by the United States Court of Appeals for the Third Circuit ("Third Circuit"), the plaintiff was transferred to a new position that decreased his commute; however, after being terminated shortly after the transfer, the plaintiff brought suit alleging age discrimination, claiming the transfer was an adverse employment action.  *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994).  Although Torre was transferred to a newly created position, he pointed out that a nearly identical position was eliminated three months prior to his transfer when the company projected there would not be enough sales to support the position.  *Id*. at 834.  The question as to whether Torre's new position was a new position at all or a dead-end position designed to make him fail led the Third Circuit to reverse the District Court's grant of summary judgment.  *Id*.  The Third Circuit held a

transfer may constitute an adverse employment action in some circumstances. *Torre*, 42 F.3d at 831 *citing Collins v. State of Ill.*, 830 F.2d 692, 701 (7th Cir. 1987). In *Langley*, the plaintiff was given a new title, new duties, and a new office after an internal reorganization eliminated her old position. *Langley v. Merck & Co., Inc.*, 186 F. App'x 258, 259 (3d Cir. 2006). Without evidence that the new position was a "dead end job" or "inferior to" her old position and "not merely different" from her old position, the Third Circuit held the plaintiff's new job assignment was not an adverse employment action. *Id*. at 260-61. Although the Court recognized that a relocation can be an adverse employment action, it held that Langley's relocation was not an adverse employment action because she presented no evidence suggesting that the new location was "demonstrably inferior" to her old office or that the move "negative[ly] impacted her career opportunities." *Id*. at 260 n.3; *see also Walker v. Centocor Ortho Biotech, Inc., 13-1855, 2014 WL 631042 (3d Cir. Feb. 19, 2014) ("Employment actions such as lateral transfers and changes of title or reporting relationships have generally been held not to constitute adverse employment actions").*

In this case, it does not appear that the move from one office to another located in the same county was an adverse employment action. Ms. Stranzl's move can be distinguished from *Torre*; although her office was relocated, her contention that the Upper Darby Office is "remotely located," Pl.'s Mem. Law Opp'n. Def.'s Mot. Summ. J. 9, is unsupported. On the contrary, the Upper Darby Office is closer in distance to Ms. Stranzl's home in Norristown although it is farther away from Widener University where Ms. Stranzl attends graduate classes. Stranzl Dep. 16:19-21. Additionally, the Upper Darby Office contains the main Human Relations Office. Def.'s Reply Br. Supp. Mot. Summ. J. 6. Moreover, Upper Darby is Pennsylvania's sixth most populated municipality, and the office's 69th Street location is located at the heart of Upper

Darby's business district. *Id*. Thus, the Upper Darby Office is not "demonstrably inferior" to the Chester Office. Moreover, the only identified "negativ[e] impact" the move had on Ms. Stranzl was that staying at the Chester Office would have been "easier than the stress of a new environment and learning something new" and it was "a lot easier because you know everybody."

Further, when Ms. Stranzl moved from the Chester Office to the Upper Darby Office, she did so as a student intern in the CWEL program, not as a caseworker. A feature of the CWEL program was a guaranteed job placement with CYS after graduation; however, there is no evidence to suggest that Ms. Stranzl was promised that her field placement would be located in the same office where she previously worked. Ms. Stranzl was only told that her field placement would be with the Delaware County CYS, not specifically in the Chester Office. Ms. Stranzl notes that fellow CWEL participant Maxwell was able to stay in the Chester Office, while she was placed in the Upper Darby Office. In line with Grant's promise made during the January 9, 2012 meeting, the Upper Darby Office is still in Delaware County, and there is no evidence to suggest that the relocation of Ms. Stranzl rather than Maxwell was motivated by prejudice or fear of disabilities. Perhaps most importantly, Ms. Stranzl remains an employee of CYS with full benefits even as she continues in the CWEL program, a program facilitated by her employer which provides her with a free graduate degree. Thus, Ms. Stranzl's move from the Chester Office to the Upper Darby Office was not an adverse employment action.

      b.   *Denial of Transfer of Files From Old Computer*

Additionally, Ms. Stranzl claims CYS committed an adverse employment action when it failed to transfer her files from her old computer to her new computer. In *Durham Life*, a case involving a sex discrimination claim, the plaintiff was a successful life insurance salesperson

who was stripped of her files after being forced from the private office for which she had

specifically negotiated. *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 146 (3d Cir. 1999).

Because without the files, it was "impossible for her to work," the Third Circuit held the denial

of the plaintiff's old files was an adverse employment action. *Id*. at 146, 153.

Unlike in *Durham Life*, there is no evidence to suggest Ms. Stranzl needed the files on her

old computer in order for her to perform her field placement internship. *See* Def's Reply Br.

Supp. Mot. Summ. J. 6.  Other than old case files and CWEL application materials including her

resume, Ms. Stranzl does not allege losing anything that is essential to her job performance and

does not claim that loss of those files made it "impossible for her to work."  Stranzl Dep. 82:22-

83:1.  When Ms. Stranzl used her old computer, she worked in the capacity of a CYS caseworker

in the Chester Office, whereas her new office computer would aide her in her field placement as

an intern in the Upper Darby Office through the CWEL program.

Although Ms. Stranzl points to the fact that Maxwell, who completed her field placement

in the Chester Office, was able to have her files transferred, there is no evidence to suggest that

Ms. Stranzl's files were not transferred because of discriminatory intent, prejudice, or fear of

disabilities.  Therefore, failure to transfer Ms. Stranzl's old computer files to her new office

computer was not an adverse employment action.

c.   *September 21, 2012 Paycheck*

Next, Ms. Stranzl alleges the issues with her September 21, 2012 paycheck are evidence of

an adverse employment action.  In *Burlington Northern*, the plaintiff received no pay for thirty-

seven days during a work suspension pending an investigation.  548 U.S. at 58.  The

investigation showed that the plaintiff did not do anything wrong, and she was awarded backpay

for all thirty-seven days.  *Id*.  Denying the defendant's motion for summary judgment, the Court

held that the factual determination of whether a thirty-seven day period without a paycheck was serious enough to be an adverse employment action was an issue for the jury to decide. *Burlington N.*, 548 U.S. at 72.  The Court's holding centered on the effects of the pay suspension, namely the physical and emotional hardship suffered by the plaintiff due to not knowing if she would lose her job and having no income to support her family.  *Id.*

Ms. Stranzl's issues regarding her September 21, 2012 paycheck are distinguishable from those issues in *Burlington Northern*.  The plaintiff in *Burlington Northern* survived summary judgment because of the perceived severity of the paycheck issue; however, unlike in *Burlington Northern*, Ms. Stranzl received her paycheck on time, but it was missing ten days of pay.  On the same day Ms. Stranzl sent a memo to Sidler regarding the missing hours, Ms. Stranzl was hand-delivered her paycheck by Sidler.  Ms. Stranzl was not surprised by the mistake, as she emailed Grotz about whether she would receive her first paycheck *before* it arrived because she thought her name was not yet in the payroll system.  The fact that Ms. Stranzl did not get an email response from Grotz or Sidler is not dispositive, as the issue was rectified in a timely manner. Additionally, Ms. Stranzl was not without income for an extended period like the plaintiff in *Burlington Northern*.  The quick resolution paired with the strong likelihood that the reason for the issue was because of an administrative lag supports the conclusion that this incident is not an adverse employment issue.

> d.    *Paycheck Issue for Pay Period Beginning November 16, 2012*

Lastly, Ms. Stranzl alleges that the failure to credit her for $212.49 not included in her paycheck for the pay period beginning November 16, 2012 is an adverse employment action.  At the crux of the *Burlington Northern* holding is the Court's concern in how the missed pay affected the plaintiff.  548 U.S. at 58.  Although Ms. Stranzl claims the paycheck was missing

fifteen hours of unexcused time off and fifteen hours of absent time and that she never received the missing pay, Defendant notes that Ms. Stranzl had recently been overpaid $7,500 during her extended leave.  Def.'s Reply Br. Supp. Mot. Summ. J. 7 n.2.  CYS made no known attempts to recover that overpayment, leaving Ms. Stranzl with an overpayment of over $7,280 after subtracting the $212.49 missing pay.  Delaware County's failure to recoup the overpayment belies Plaintiff's allegations that she was discriminated against on the basis of her disability.  On the contrary, the waiver of the overpayment by Delaware County undermines Plaintiff's argument, and the second paycheck problem in November, 2012 does not rise to the level of an adverse employment action.

Because none of the four claimed incidents constitutes an adverse employment action, alone or aggregated, summary judgment must be granted for Delaware County on Ms. Stranzl's ADA claim in Count I of the Amended Complaint.[7]

## B.   Count II: PHRA Claim

The United States Court of Appeals for the Third Circuit applies the same standards and analysis of an ADA claim to PHRA claims.  *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).  As discussed above, "trivial harms," "petty slights or minor annoyances" are not materially adverse and thus do not constitute adverse employment actions.  *Burlington N.*, 548 U.S. at 54; *see also Uber*, 887 A.2d at 368.

Ms. Stranzl identified one instance to support her PHRA claim: that she suffered discrimination when she did not receive return emails or calls from Bradley or Ayres regarding her lapsed medical insurance.  Following her extended leave without pay during which she paid COBRA medical benefits, Ms. Stranzl's medical insurance coverage expired on August 31,

---

[7] Although Defendant's counsel provides general case law discussing adverse employment actions and a detailed, factually- based argument as to why each alleged incident is not an adverse employment action, he cites no case law in support of his position that each alleged incident is not an adverse employment action.

2012.  However, after she returned as a full-time student on August 28, 2012 and for her field placement internship on September 4, 2012, Ms. Stranzl did not realize the lapse in coverage until nearly November 2012.  Ms. Stranzl called Ayres to inquire about her insurance coverage; Ayres told Ms. Stranzl to call Bradley.  After two weeks of calling Bradley without success, Ms. Stranzl emailed Ayres again on November 19, 2012, relating her unsuccessful attempts to contact Bradley.  On that same day, Ayres contacted Bradley and Ms. Stranzl's medical coverage was reinstated.  Ms. Stranzl's presents no cases to support why the failure to return Ms. Stranzl's calls followed by the swift rectification of the insurance issue constitutes an adverse employment action.  Accordingly, and in line with the discussion regarding Ms. Stranzl's ADA claim, summary judgment is granted to the Defendant on Ms. Stranzl's PHRA claim in Count II of the Amended Complaint.

## C.    Count III: FMLA Claim

In Count III of her Amended Complaint, Ms. Stranzl claims that she suffered retaliation for exercising her right to take FMLA leave.  The FMLA seeks to "entitle employees to take reasonable leave for medical reasons" while "balanc[ing] the demands of the workplace with the needs of families."  29 U.S.C. § 2601(b)(1)-(2).  The FMLA entitles an employee to twelve work weeks of leave during any twelve month period for "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  Following return from FMLA leave, an employee is entitled to be restored to the same or an equivalent position.  29 U.S.C. § 2614(a)(1)(A)-(B).

The FMLA creates two distinct causes of action: interference and retaliation.  29 U.S.C. § 2615(a)(1)-(2).  Interference claims arise from violations under 29 U.S.C. § 2615(a)(1), which provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of

or the attempt to exercise" any right secured by the FMLA.  To assert an interference claim, the plaintiff need only show "[s]he was entitled to benefits under the FMLA and that [s]he was denied them."  *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005).  Thus, an interference claim focuses not on discrimination but on whether the employee was denied his or her FMLA rights.  Because Ms. Stranzl successfully exercised her right to FMLA leave, her claim is brought under a retaliation theory.

A discrimination or retaliation cause of action under the FMLA makes it unlawful for an employer "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  29 U.S.C.A. § 2615(a)(2).  In order to prove FMLA retaliation, an employee must show that her employer intentionally discriminated against her for exercising an FMLA right.  *Atchison v. Sears*, 666 F. Supp.2d 477, 490 (E.D. Pa. 2009).  In the absence of direct evidence of FMLA-based discrimination, to establish a prima facie of FMLA retaliation, the plaintiff must show: (1) she is protected under the FMLA; (2) she suffered an adverse employment action; and (3) there was a causal connection between the employee's protected activity and the employer's adverse employment action.  *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009) *citing Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).  Following a showing of a prima facie case, the burden shifts to the defendant pursuant to the *McDonnell Douglas* framework.  *Atchison*, 666 F. Supp. 2d at 490.  If the defendant can give a non-discriminatory reason for the adverse employment action, the plaintiff is afforded the opportunity to debunk the defendant's reason and prove an inference of discrimination.  *Solomon v. Sch. Dist. of Philadelphia*, 882 F. Supp.2d at 782 (E.D. Pa. 2012).

1.   Protection Under the FMLA

The FMLA entitles an employee to a total of twelve workweeks of leave during any twelve month period due to a "serious health condition that makes the employee unable to perform the functions of the position."  29 U.S.C.A. § 2612(a)(1)(D).  Thus, taking FMLA leave is a protected activity under the FMLA.  To be eligible for benefits under the FMLA, an employee must have been employed for at least twelve months by the employer from whom the leave is sought and for at least 1,250 hours of service during the previous twelve month period.  *See* 29 U.S.C. § 2611(2)(A).  It is uncontested that Ms. Stranzl worked the requisite number of hours to be considered eligible for benefits under the FMLA.

In providing notice to the employer that she is taking FMLA leave, the employee need not use certain magic words or mention the FMLA; "the critical question is how the information conveyed to the employer is reasonably interpreted."  *De Luca v. Trustees of Univ. of Pennsylvania*, 834 F. Supp.2d 282, 290 (E.D. Pa. 2011) *quoting Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007).  The parties do not dispute that Ms. Stranzl was protected under the FMLA or whether she gave sufficient notice that she was taking FMLA leave.  Both her treating psychiatrist and workers from Project Reach, the mobile mental health unit, recommended that Ms. Stranzl needed time off from work.  Ms. Stranzl's FMLA leave was approved on March 12, 2012 to be effective until June 4, 2012.  After an extension recommended by her psychiatrist, Ms. Stranzl's leave was extended to September 12, 2012, and she returned from leave as a full-time student on August 28, 2012 and for her field placement internship on September 4, 2012.  Thus, Ms. Stranzl exercised her right to take FMLA leave.

2.   Adverse Employment Action

Although it is undisputed that Ms. Stranzl exercised her right to FMLA leave, the only

alleged adverse employment action she identifies in connection with her FMLA claim is the change in her office location upon returning from FMLA leave.  This move from the Chester CYS Office to the Upper Darby CYS Office was not an adverse employment action for the same reasons explored in the ADA discussion above—(1) the move caused no identifiable harm other than Ms. Stranzl's contention that it would have been "easier" to stay in her old office; (2) she moved to the Upper Darby Office not as a caseworker but as an intern through the CWEL program; (3) although guaranteed a free Master's degree and a job with CYS after graduating through the CWEL program, she was never promised that her CWEL field placement would be located in the Chester Office; and (4) the fact that Maxwell did not change locations is not dispositive without discriminatory intent.

     3.   <u>Causal Connection</u>

The "sheer proximity" between FMLA leave and an adverse employment action is often enough to establish a causal connection for a *prima facie* FMLA retaliation claim.  *Baltuskonis v. US Airways, Inc.*, 60 F. Supp.2d 445, 448 (E.D. Pa. 1999); *Voorhees v. Time Warner Cable Nat. Div.*, CIV. A. 98-1460, 1999 WL 673062 (E.D. Pa. Aug. 30, 1999) (holding "reasonable jury could infer a causal connection between Voorhees' leaves of absence and her termination from the close proximity in time between her leave of absence and the adverse employment actions she suffered").   Because we have determined that Ms. Stranzl did not suffer an adverse employment action, there is no need to consider whether there is a causal connection between Ms. Stranzl's exercise of her right to take FMLA leave and any alleged retaliatory action by Defendant.  Accordingly, summary judgment is granted in favor of Defendant for Count III of Ms. Stranzl's Amended Complaint.

**IV.    <u>CONCLUSION</u>**

In viewing the facts most favorable to the non-movant, Ms. Stranzl, she fails to present any disputed issues of material fact sufficient to show that there is a genuine issue for trial.  Thus, summary judgment is wholly granted in favor of the Defendant, Delaware County.

An appropriate Order follows.